L.P. v. City of Coppell I hope there are no waterways of the United States in the city limits of Coppell. I don't have to worry about that issue. I want to start my argument in this land use case by addressing the Court's letter about the Patel case, Article I, Section 19 of the Texas Constitution and the Due Course of the Law Challenge. Our review of the Patel case leads us to conclude that it does apply to a due process challenge in this land use context. We did not see any language limiting the majority's opinion from the Texas Supreme Court on the scope of that. And we believe that Patel does apply and that it provides actually an additional step that needs to be taken to analyze the due course challenge in this case. And, Your Honor, I want to address that just briefly because in Patel, the second step is that the question is whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest. And we addressed our briefing to the federal standard, the rational basis test, but we believe that we would also satisfy the less deferential to the government test. It looks as if the Supreme Court is now less deferential, that's for sure. Yes, Your Honor. Okay. Turning to the substantive due process claim in this case, Hackbelt's position is that the city violated due process by arbitrarily denying Hackbelt's request. And as we've stated in our briefs, the city's decision was arbitrary for several reasons. First of all, because as the district court determined in its order, Hackbelt's zoning request fully complied with the city of Cuphill's master plan. And that's a key point to our argument. Obviously, that is not enough to prevail under a due process challenge. But Judge Godbee did make that determination in his order. And the next step in the analysis is to look at what was the city's decision. And in this case, after the parties, Hackbelt went back and forth several times with the city. The city made several requests to modify the application, and Hackbelt complied with all of those requests. And then the city, nonetheless, denied the application. And our position is that because the master plan, at the time it was passed, stated the interests of the city and the general welfare of the city with respect to mixed-use development, and it was a document that had been developed over a number of years by the city of Cuphill, and because Hackbelt complied with that, that there needed to be some pretty significant reason from the city to justify denying the application. Well, just for my personal information, what has happened to the property since then? I know you sold it. Has it been developed? Actually, Hackbelt still owns it. Oh, you received an offer for it. Yes. Okay. Hackbelt still owns the property. So it's still agricultural. Right. It's undeveloped at this point. Okay. Well, as I was trying to conceptualize this in my own mind, admittedly what you have from the members of the council are pretty vague objections, but suppose Hackbelt's proposition had been, we're going to build to fulfill the hotel requirement, we're going to put in a Motel 6, and we're going to put in a tanning salon and a nail salon and a massage salon for the businesses, and then have these apartments, which are, you know, grade C apartments or something like that. You would understand. One could understand why the city might not find that consistent with its proposal to upgrade the image of the downtown or whatever it is. Correct. That's right, Your Honor. So it's one thing to say your plan complies, but what do you mean by how do you say it was so unequivocally fulfilling the goals of the city that they had no alternative but to accept your proposal? Well, I think the answer to that question, Your Honor, lies in the city's stated reasons for denial of the application, and as Judge Godbee stated in his order, there were five of them, the first being now is not the right time, and we've addressed that in the brief. It's important, I think, when you're looking at that issue to see that the city passed the master plan as an ordinance and it became immediately effective. So if there were any indication or any desire by the city that the ordinance or the master plan not become immediately effective, the city certainly could have put that limitation on it, but they did not. So that is the first one, and our position is that now is not the right time is not. Well, that's the least, that's a weak argument. So what are the others? The others, the second reason was it just doesn't have that feeling. The second reason given by the city council was it just doesn't have that feeling, and I honestly don't know what that even means, and I don't know how you could evaluate that in light of the master plan and the ordinance that the city had passed stating that its purpose was to give guidance to landowners and developers on how they could bring mixed-use development into the city. The third reason given was, quote, with me, it's a personal feeling I have. Well, what was the nature? Can you expand at all on Hackbelt's proposal? I mean, I realize you added you made the business, the retail, and the residential contiguous are in the same buildings, and you had a lot of trees and so on, but what hotel were you thinking of? Did you have any contract or any proposals? I'm not sure of the answer to that. I know there was a proposal, but I don't know if the contract is in the record, but I will look at that and try to answer it. Well, did the city know what your plan was? Yes, they did. In that detail? I think they did, yes, Your Honor. So are we getting into an aesthetic judgment? Well, if it is, it's not stated as one, and that's the difficulty of it. If the members of the council had said that this had stated a reason within the general welfare such as that, I think we'd have a different case. But what they did say, these all look like personal statements or personal opinions that don't tie in with the welfare of the city. It's nothing like, you know, the justifications that we've seen in other cases where there's talk about traffic or safety or, you know, those kinds of, I believe the term used in the case law is the usual justifications. We don't have that in this case. So that's the you have these personal judgments of the city council members without any tying them, any evidence tying them to the general welfare of the city. Not even the term general welfare was used. The fourth reason, Your Honor, please bear with me. I'll go through the whole list if that's all right. That's fine. The fourth stated reason was, quote, I'm beginning to think that mixed use is in the eye of the beholder. Again, Your Honor, this is to a developer who's working over a period of more than a year at some considerable expense to develop a plan, an application that complies with the master plan. This is another statement that it's hard to see what action you could take in response to that in order to obtain approval of your application. The fifth point cited by Judge Godbee was, quote, we've always been looking for that golden hotel to come in or something, and I don't think this is it. There was also a reference to an ideal hotel. Again, I don't believe the record indicates any particular dissatisfaction by the city council with the hotel project itself. It's just some vague abstract notion that it's not ideal or it's not golden. And the question is, under the proper legal analysis, is that a rational, does that provide a rational relationship to the city's general welfare? And Hackbell's position in this case is that all of these statements don't tie into the general welfare and don't promote the general welfare and don't have that rational basis, don't have the rational relation there. And, in fact, they are inconsistent with the master plan and the efforts that Hackbell undertook to try to comply with the master plan. And isn't it correct that by the time you were in your second and third iteration that their employees had recommended approval? Yes. Now, that brings up another issue, though, that's related, and that is the procedural irregularity in the consideration of the application. The court may recall from the briefing that during the time the application was under consideration by the city, it became apparent to the city, at least in their minds, that they needed or they thought they needed more mixed-use development ordinances. And so this is all covered in the briefs, but let me give you the timeline just a little bit. Those ordinances called MXD-1 and MXD-2, the city wanted, actually wanted Hackbell's application to be considered under those ordinances in addition to the master plan. And what happened was on April 8, 2014, three things happened at the city council that are important to this case. The first one is that the city, without providing notice in a public hearing, et cetera, as required by Texas law, the city passed ordinances MXD-1 and MXD-2. The second thing that happened that day at that meeting was that Hackbell's application for mixed-use development under the master plan was denied by the city. And the third thing that happened, and this is relevant, Your Honors, to Hackbell's equal protection claim, on that same day the city council approved the application of the avenue at Denton Tap, which was another entity that had a smaller proposal for mixed-use development that did not satisfy the requirements of the master plan under which the avenue had applied. Well, that was a very small. Yes. That was like one little apartment building, right? That was two acres, I believe, Your Honor. Yeah. And just jumping to that equal protection argument very briefly, the issues that we have with that is that the district court found that the avenue was not a comparator for purposes of the equal protection analysis, and we believe that the district court did not properly apply the summary judgment standards and did not view the facts and inferences in the most favorable light, et cetera, as required under a proper summary judgment analysis. Am I not correct that, aside from Supreme Court cases, the governing law in this circuit was set many years ago in the Shelton versus City of College station? Yes, Your Honor. We believe Shelton is still in terms of the federal substantive due process. And that said, if there's any conceivable basis for a zoning decision, we don't review it from a standpoint of substantive due process, right? Correct. Yeah. Okay. Your Honor, I want to turn briefly to the regulatory taking claim. And as the Court is aware, regulatory taking claims are governed under the Penn Central Transportation versus New York City standards. Although there's no set formula for evaluating regulatory takings, the factors include the economic impact of the regulation on the claimant and particularly the extent to which the regulation has interfered with distinct investment-backed expectations. And the district court found that Hackbelt's ‑‑ basically, Hackbelt did not have any investment-backed expectations because the property, they owned agricultural property before they applied, and they still own agricultural property. How much has Hackbelt invested in the plans that it developed? The record showed, and the district court stated in its order, that Hackbelt had incurred $235,000 of termination fees with respect to the contracts for development that were not implemented. And the court also found that the value of the development contracts was over $5.5 million.  You have time for rebuttal. Thank you. Okay, Mr. Tatum. May it please the Court, to answer a couple of questions or to respond to a couple of questions that came up earlier, it is our belief, and if I have a ‑‑ this is not part of the record because we were unable to submit it as part of the record, but it appears that at least a portion of the property in question has indeed been sold in answer to the Court's question. And if the Court would prefer, we can submit documents that evidence that post-hearing, if that's important. Well, so basically you ran them out of town. Well, Your Honor, we ‑‑ they don't ‑‑ the entire portion wasn't sold. Only a part of it was. All right. So at least according to the documents that we have, and I admit this is a very recent ‑‑ Well, I admit I have a hard time with these kinds of cases coming from the City of Houston. I understand. May it please the Court, as Judge Higginbotham stated over 20 years ago in Shelton, this Court has long insisted that the review of municipal zoning is within the domain of the states, the business of their legislatures, agencies, and judiciaries, and should seldom be the concern of federal courts. In the absence of invidious discrimination or infringement of fundamental interest, this Court's review is confined to whether the decisions were arbitrary and capricious, and the requirement of substantive due process under the 14th Amendment is met if there is any conceivable rational basis for the zoning decision. The Court's, I'm sure, well aware of that standard. What's a conceivable rational basis? The fact that ‑‑ is the mere fact that several ‑‑ that the majority of counsel voted against this, is that a rational basis? It depends on the reasons why they voted against it, and I believe the record is very clear about those reasons. The ‑‑ at pages 4 through 6 of our brief, the members of the counsel are quoted at length regarding the reasons why they felt like this project just wasn't what they were looking for. Councilmember Duncan, it looks like it needs to be designed holistically. He had an objection with the appearance of three different projects in one. Councilmember Brancheau, I'd like to see more retail and commercial incorporated in the residential portion. Both of those are, you know, I think very reasonable concerns. I don't understand that at all. Why do you think people really want to live over a pizza parlor? Your Honor, I don't know, but I do know that there are a lot of developments in the Fort Worth Dallas area that are exactly that, and they appear to be very popular. But it doesn't really, in terms of this court's ‑‑ Going with the flow in terms of their design preferences. Well, in terms of this court's review, the reason why people want to do that is unimportant. I understand that, but I'm just trying to understand, because it doesn't make sense to me, but what you're saying is they were going with, they were trying to make Capelle look like all the other suburban developments. That's a fair comment, and it's a perfectly appropriate thing to be doing. I'm not making an aesthetic judgment. I'm just trying to understand it. Well, and it's clear that their comments were informed and influenced by other developments in other parts of the metroplex. Southlake, for example, has a Southlake Town Square. Where's Southlake? Southlake is about 20 miles west of Capelle, roughly in the same latitude, but it's on the other side of the airport. Well, I'm sorry. Okay, so it's all to the west of DFW toward Fort Worth? Correct. Okay. But, I mean, in terms of that community, it is similar to Capelle in size, and it's a little bit more urbanized than Capelle is. But, again, it's, I think, a rational use of public city land. The substantive, and I probably should turn to Patel also at this point. The court asked whether it informs it regarding the decision here. In our view, Patel created a second basis against which to measure governmental action that's applicable more to individuals, statutory schemes, and the like, and really isn't. But they do cite Mayhew. I'm sorry, Your Honor? They cite what grabbed my attention is that they do cite Mayhew as supporting their approach to economic regulation. You're absolutely right, Your Honor. And that case actually is a fairly important part of our position as well. But I think on the facts. Only if Mayhew supports you. I think on the facts, the. . . Yeah, I mean, Patel is. . . Patel's situation involves a different economic group, individuals rather than municipalities, individuals rather than neighborhoods or city developments, and that sort of thing. It's our view that it doesn't inform the court. But if the court chooses to look to that, I think it doesn't change the result. In this case, the landowners came back to the city government two times. That's not an unreasonable burden in my view. Well, you're saying that wasn't enough. So basically they were going to have to come back three times if they were going to satisfy this. The concern is residential. . . Let's see. You could get more of a flavor of a mixed use. I would like to see the degree of work done as I have on the entire development as I have on the residential pieces. I would like to see more retail and commercial incorporated in that residential portion. Correct. Both of which comments were comments that were more specific than the hack belt parties have been alleging in this lawsuit. You could take those comments and there would be at least some indication how to modify the plan to take care of the council's concerns. There were other concerns. . . I'm sorry, Your Honor. I worry about the cohesiveness. As one of the objections. . . One of the council members. There are really three questions here. One, is it right? Is it the right time? And is this the best that we can do? And I think probably no at all counts. And that is two comments on pages four, five, and six. There are some much more specific comments about. . . Yeah, the Golden Hotel. I mean, it appears to be more of a shared use than a mixed use. What does that mean? The concern of the city council was that the design that was presented appeared to have three different parts, a hotel over here, residential here, and retail over here. They weren't. . . Well, you're not going to mix the hotel and the residential. Well, the hotel perhaps is a different issue, but I'm not sure they even got to that point. The problem was that they were separated. It's my understanding that's what the. . . That was the first plan. Right. But the second plan brought the retail and the apartment closer together. That's correct. And my understanding was that the second plan didn't have enough of those things to satisfy the council. I mean, you know, there's a whole lot of developers, you know, jargon in this, and I don't understand it. So you tell me there's substance to it, but I just don't understand what these characterizations mean. Well, I can't enlighten the court any more than I think we already have. Well, in developer speak, why are they rational? Excuse me? In developer speak, why are these statements a rational basis, if you don't even know what the language means? Well, the language, I think, was very clear to the people making it. And I think if you look at the comments on four and five. . . They don't have to talk about safety. They don't have to talk about mobility. They don't have to talk about encouraging families and single people in the same units. They don't have to talk about we want Rodeo Drive rather than Target. You know, they don't have to say anything specific. But the fact that they don't like it and they vote against it gives it a conceivable rational basis. I believe that's the standard, Your Honor, that any conceivable rational basis is a very broad standard. Suppose they had modeled themselves specifically after Southlake. Well, I think there were some comments about Southlake in the record. I want you to quote. . . And I think that would be very appropriate and a clear indication of what they were looking for. What didn't happen here was that the developer didn't try to discern exactly what they were talking about, to try to find out anything more about their. . . He satisfied the employees of the city on the second go-round because they recommended approval, right? That's correct. But they didn't satisfy the council, and the council's questions weren't. . . I guess were not clearly addressed. But getting back to the standard, though, any rational basis, even if it's not one that the council adopted, is sufficient to uphold the court's judgment. This was the city council giving these reasons, not developers, right? So we're talking about ordinary citizens that get elected on the city council that are given these reasons for denying this rezoning request. That's correct. I don't know that any of these people were involved in design or construction. I assume Hack Belt was present at this council meeting? Yes, they were. Okay. And I know I didn't look at this before I came here, but it said there was extensive discussion, and it cites 60, 70 pages of transcript. I assume that's. . . Does that show Hack Belt making a presentation? Yes. It does? I think so, yes. Getting back to the standard the court is directed to use by the circuit, in the absence of any invidious discrimination, and by the way the allegations of discrimination here I think are baseless, suspect classifying criteria or infringement of fundamental interest, the review of quasi-legislative decisions is combined to whether the decisions were arbitrary and capricious. That is a very low bar. This requirement of substantive due process under the 14th Amendment is met if there was any conceivable rational basis, any conceivable rational basis. I think what that comment means is that even if it wasn't the basis upon which the decision was made, if there is a rational basis, then there is no due process violation. Now Mayhew is arguably a little more narrow than that, right? Yes, but the language at least allows at least a great deal of leeway in the consideration. Any conceivable rational basis for a zoning decision is a pretty big bucket, and I think that in this case. . . Can a rational basis be we don't want a Motel 6, we'd rather have a, I don't know, Caesar's Palace or something. Yes. Some fancier hotel. We don't like this hotel or the reputation of this hotel. We want something nicer and bigger, fancier, and that's a good reason. That's a rational basis. Or enough of a reason. Yes, that's a rational basis. The comments really that were listed at pages 4 and 5 of our brief, they indicate rational ideas. The thing needs to be designed holistically as opposed to there was a concern that there was a construction here, construction here, and construction here on the property, but they weren't connected or integrated in any way. Well, again, people who go to a hotel don't want to trip over a lady, you know, strolling her baby to daycare. Well, that's. . . I mean, to me, I don't understand what holistic means. Well, the next comment, this looks like it's three different projects in one. That informs them that there's at least some integration that needs to happen in the design. Well, they were all off property. I mean, when you look at the chart, you know, you had one or two main entrances, and then you had this landscaping around the parking area, and then these things interspersed around the parking area. So, I mean, again, I'm just going off of my driving around Houston experience, which is that this is not an unusual way to configure a property in Houston. I realize you have higher standards in the Dallas area. Very loose zoning ordinances, but it is. . . this is something. . . Part of the rational basis was we don't want a Houston in our backyard. You know, Your Honor, I think that living up there, I think I would agree with that, but I'm sure the members of the Court wouldn't. But, you know, looking at the comments, they are, I think, sufficient to be able to give the potential developer enough guidance about what to do about fixing it. First of all, Mayhew says, A court should not set aside a zoning determination for substantive due process unless the action, quote, has no foundation in reason and is mere arbitrary or irrational exercise of power, having no substantial relation to the public health, the public morals, the public safety, or the public welfare in its proper sense. And then they denied relief in that one because it had to do with urbanization effects. So what is, you know, what is the public welfare in the proper sense in terms of Mayhew, not Shelton? Well, in terms of Mayhew, I believe that that's what the council was going for. In the comments that they made talking about how they wanted this project to be, you know, that was at least directed to the public welfare, the concern for residential construction on it, mixed-use developments, which are all the rage in North Texas now, and they are in other places, and they do indeed have some public benefit. Has, have any courts in the lower Texas courts since Mayhew rejected any zoning decisions that you're aware of? No, Your Honor. You're not aware of them, or they haven't? I'm not aware. Okay. I'm not aware. Anyway, the, to address some of the other issues that were raised in the direct, the Denton Tap project, which was approved around the same time that this project was not approved, is a very different kettle of fish. It's not comparable to the Hack Belt development because Hack Belt had roughly 20 acres. The Denton Tap approval had less than two. There was no hotel in that project. There were multi-story, and they met, that project met desired ratios for residential and retail. And it was also designated a mixed-use neighborhood center, a different designation than the Hack Belt project had been given. So I think the Denton Tap really is no evidence of any invidious action by the city council because it was an entirely different project. Regulatory taking. I'm sorry, Your Honor. The regulatory taking issue. Regulatory take. Well, the regulatory taking issue, I think, is governed by the case law which says that there is no regulatory taking if there is no diminution in value of the existing property at the time of the municipal decision. Let me ask you a question. How many other, I mean, this is how many, seven acres? No, I believe it was more than that. More than seven acres. Yeah. Yeah. A substantial property. It was almost 20 acres. I'm sorry. I should have remembered that. Okay. So it's 20 acres. And I'm just wondering how many parcels of 20 acres were in Capel or around Capel that would have been amenable to the new mixed-use concept of their development plan. The record doesn't disclose whether there were any, but I suspect that if there were, there was no more than one or two others. So. But I don't know that. Well, I'm sort of inferring that myself. So if that's the case, why do they not have investment-backed expectations when they buy this huge expanse of vacant land right adjacent to the city and clearly within the mixed-use master plan? Well, I'm sorry. Go ahead. We have had investment-backed expectations, but those are not relevant to an issue of taking. That is, we've cited that in one of the cases in our brief, but it is not a relevant issue on a taking issue. Regulatory taking. Yes. I thought investment-backed was part of the test for regulatory taking. It's, let's see. He said. I believe it was FM Properties, but I may be wrong about that. Judge Godby just said that it's zoned agricultural and you don't have any kind of claim for anything more than that. But I just, I find that hard to believe in light of the. I'm sorry. It is Mayhew and Anders versus Allard, the two cases. Mayhew is not a regulatory taking case. It's the Penn Central standard. Okay. Maybe I'm wrong, but, well, maybe you can address that in a 28-J letter if you need to. Thank you, Your Honor. All right. Thank you. Mr. Wright. Your Honors, I'm going to first address this regulatory taking issue from Mayhew. And we've cited this language in our brief. But the Mayhew case says the existing and permitted uses of the property constitute the primary expectation of the landowner that is affected by regulation. And, Judge Jones, you were absolutely right. The property here was in the middle of this mixed-use development. So the permitted use was and is mixed use, and that was the expectation. So at the very least, Judge Godbee sort of misapprehended what the parameter was. I believe he did. Simply by saying it was agricultural and, therefore, you have no right. I mean, yeah, okay. I believe that's right. I also want to address the questions that came up regarding the types of businesses that would come in under the development if it had been approved. And I think I didn't do a very good job explaining that up front. The plan was conceptual. And what actually would happen in terms of which businesses would come in if it had been approved, which businesses would go into the mixed use would still be subject to later permit approval by the city. So they were not at the point of saying this hotel or that retail business. Right. So that would have been determined later. But my understanding is that there had been some concern. Somebody made the comment at some point, it looks as if you're going to build the apartments and you're going to add the retail and the hotel later on. Right? I mean, wouldn't that have been a legitimate concern? I think it would have been. I think it could have been. And I think that that would have been addressed in the process up to the point of the denial. I think the developer was trying to address those kinds of issues. And I think if that had been a factor for the city, that they would have said so. But I don't believe they did. In this 60 pages of transcript that they cite, which evidenced the public hearing, what presentation did Hackbelt? I mean, because I'd forgotten by this time planning and zoning had actually the staff recommended approval. The Planning and Zoning Commission recommended denial. And so Hackbelt was appealing to the city council. So what was Hackbelt's presentation? Your Honor, I can't call those details at this moment. If the court would permit, we would make a short submission after argument. Well, we have the record online. I was just hoping we could know how Hackbelt was attempting to address these comments. Well, I can't speak specifically to them. But in general, they were trying to address everything that came up to the satisfaction of the city. All right. And I'm sorry I don't have more detail for the court on that. With respect to the procedural posture of this case, this, of course, comes to the court as a summary judgment. And one case I wanted to mention before concluding was the city of Monterey case from the Supreme Court. Because that case is very similar factually, we believe, to the facts of this case. And that is a case where the developer made application and kept coming back, essentially, to the city of Monterey. And the Supreme Court described or perhaps the Court of Appeals described the reasons given by the city for denying the application as being very general. And what's important about the city of Monterey is, of course, that the Supreme Court, the Court of Appeals reversed the summary judgment and the Supreme Court affirmed that. And we understand that it's unusual, that a summary judgment reversal, or I'm sorry, a trial is unusual in this context or can be unusual in this context, but we cited the city of Monterey for the proposition that it's not unheard of. And where the facts support it, we think it's appropriate. And we believe that there are fact issues with respect to each of Hackbelt's claims in this case. That was a takings claim, though. It wasn't regulatory taking. It was taking. Yes, that's correct. So doesn't that put a different cast on it? I think in terms of the – I'm sure you can still graze cattle on this land. Well, I'm not sure we can now if it's in the middle of mixed-use development. I think the city might have a problem with that. But you're right, Your Honor, that is a takings case. But they can only tax you at agricultural levels, right? Hopefully. I believe that's true, but outside the record, I hope that's true at this point. Okay. Thank you very much. Thank you, Your Honor. Okay. Well, the court will be in recess because we just don't have any other arguments.